IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

ASHER JOSEPH ROSENZWEIG                                             PLAINTIFF

v.                         Civil No. 5:22-cv-05125-TLB-CDC

DEPUTY LARALYN KOSTER; and
NURSE TRACEY ROBISON, LPN                                          DEFENDANTS

## REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

This is a civil rights action filed by Plaintiff, Asher J. Rosenzweig, pursuant to 42 U.S.C. § 1983.   Plaintiff proceeds *pro se* and *in forma pauperis*.   While incarcerated at the Benton County Detention Center ("BCBC"), Plaintiff contends his constitutional rights were violated when:  (1) Deputy Koster used excessive force against him; and (2) Nurse Robison denied him adequate medical care for a serious knee injury.

Pursuant to the provisions of 28 U.S.C. §§ 636(b)(1) and (3), the Honorable Timothy L. Brooks, United States District Judge, referred this case to the undersigned for the purpose of making a Report and Recommendation.   The case is before the Court on the Motion for Summary Judgment filed by Deputy Koster (ECF No. 20) and the Motion for Summary Judgment filed by Nurse Robison (ECF No. 27). Plaintiff has responded (ECF Nos. 26 & 32) to the Motions.

## I.  BACKGROUND

### A.  Factual Evidence

Plaintiff was booked into the BCDC on May 17, 2022.   (ECF No. 22-2 at 1).[1]   He

---

[1] All citations to the summary judgment record are to the CM/ECF document and page number rather than the exhibit designation given to the documents by the parties.

1

remained incarcerated there until June 27, 2022.   *Id.* at 2.

To fully understand Plaintiff's claims, the Court must begin with a knee injury Plaintiff sustained prior to his incarceration.   On December 17, 2021, Plaintiff was involved in an accident while riding a scooter.   (ECF No. 22-7 at 9 &15).   He hyperextended his leg causing it to swell to the size of a "cantaloupe."   *Id.* at 15.   He had difficulty walking.   *Id.*

On December 25, 2021, after the swelling in his knee was partially alleviated, Plaintiff went to the emergency room of Washington Regional.   (ECF No. 22-7 at 16);(ECF No. 22-8 at 16).   Plaintiff was diagnosed with a patellar fracture and knee derangement.   (ECF No. 22-8 at 16).   He was given prescriptions for acetaminophen-Hydrocodone and diclofenac.   *Id.* at 18.   Plaintiff was directed to follow up with Dr. Coker at Ozark Orthopaedics.   *Id.*   A knee immobilizer and crutches were dispensed to Plaintiff.   *Id.*

On December 30, 2021, Plaintiff was seen by Dr. Coker.   (ECF No. 22-9 at 8).   Plaintiff was diagnosed with a possible Segond fracture and ligament injury.   *Id.* at 9.   The plan was to get an MRI of the knee and then follow up with Dr. Coker.   *Id.*   Plaintiff was instructed to take one 800 mg tablet of Ibuprofen three times a day and prescribed oxycodone to be taken every six hours as needed for pain.   *Id.* at 8.

Plaintiff did not have health insurance at the time and informed Dr. Coker.   (ECF No. 22-7 at 20).   Dr. Coker indicated they could not move forward until the MRI was done.   *Id.* Plaintiff attempted to obtain health insurance through HealthCare.gov but was "put . . . on some sort of back burner."   *Id.* at 24.

In February of 2022, Plaintiff went to the Community Clinic hoping to obtain an MRI without insurance.   (ECF No. 22-7 at 17-18).   Plaintiff was still using the immobilizer but was

able to use a cane to ambulate rather than crutches.   *Id.* at 18.   He was seen by a nurse practitioner who referred Plaintiff to a physician.   *Id.* at 26-27.   For some reason, Plaintiff missed the appointment.   *Id.* at 27.

The nurse practitioner had given Plaintiff another brace that he wore inside the immobilizer.   (ECF No. 22-7 at 27).   The brace resembled a "black sock" that fit over his knee but had hinges on each side to "tighten it or loosen it."   *Id.*   By this time, Plaintiff described his pain as manageable.   *Id.* at 29.   On a pain scale of 1 to 10 with 10 being the most pain, Plaintiff assessed his pain as "at least a constant 3."   *Id.*   However, if he stepped wrong, the pain spiked to a 7 or 8.   *Id.*

By late April of 2022, Plaintiff was able to get around just using the brace and immobilizer. (ECF No. 22-7 at 21).   He was still in significant pain if he moved wrong or slipped.   *Id.*

On May 2, 2023, Plaintiff was again seen at the Washington Regional Emergency Department.   (ECF No. 22-8 at 3).   This visit was made after Plaintiff was in an altercation.   *Id.* Plaintiff sustained fractures of the nasal bones on both sides of his nose, a stab wound in the neck requiring stitches, and a laceration on his arm.   *Id.* at 3, 5-6, & 10.

When Plaintiff was booked into the BCDC on May 17, 222, he was wearing a compression sock, an ace bandage, compression pants, and the hinged brace.   (ECF No. 22-7 at 33-34).   He was not wearing the immobilizer.   *Id.* at 34.   Plaintiff indicated his pain at that point was still a constant 3.   *Id.*   He was not taking anything stronger than Ibuprofen for the pain.   *Id.* at 35.   He would take a couple Ibuprofen every day or so.   *Id.*

Plaintiff was directed to put on a jail uniform.   (ECF No. 22-7 at 37).   He did so but was "wearing some of" his material/equipment to support his knee.   *Id.*   Jail personnel would not

3

move Plaintiff to a pod until he took "them off." *Id.* At first, Plaintiff was placed in the medical pod where he shared a cell with one other person. *Id.* at 37-38. He believed the placement in the medical pod was related to COVID. *Id.* at 42. He thought he would be able to retain his knee support since he was in the medical pod but this was not allowed. *Id.* at 37-38. Plaintiff remained in the medical pod for three or four days and then was moved to general population. *Id.* at 38. Plaintiff was housed on the bottom tier and had a bottom bunk. *Id.* at 44.

On May 21, 2022, Plaintiff asked for his knee brace back. (ECF No. 22-7 at 40 & 42). Nurse Robison advised Plaintiff he would have to be moved to the medical pod if he required his knee support. *Id.* at 40-41; *see also* (ECF No. 22-3 at 1 (kiosk entries)). Plaintiff did not want to be placed in the medical pod as it would result in him being locked down twenty-three hours a day. *Id.* at 41. He felt like such a move amounted to him being punished for having an injury. *Id.* He understood the detention center personnel were concerned that the brace could be weaponized. *Id.*

On May 24, 2022, Plaintiff asked for his compression pants saying he did not want to be moved to the medical pod but needed some support for his knee. (ECF No. 22-7 at 43). He was told he could not have personal property in general population. *Id.* at 44; *see also* (ECF No. 22-3 at 1).

In Plaintiff's opinion, he should not have been given the option of remaining in general population and should have been told he would be housed in the medical pod due to his injury and need for a brace. (ECF No. 22-7 at 59). Plaintiff testified he should have either been placed in the medical pod or kept safe from further injury to his knee. *Id.* at 59-60.

On May 31, 2022, Plaintiff was just leaving his cell when the SERT team entered the pod

4

for a shakedown.  (ECF No. 22-7 at 44-45).  Getting face down on the floor, Plaintiff army-crawled out of the doorway.  *Id.*  Plaintiff testified he did not have trouble getting down or crawling out the door.  *Id.* at 45.  After he was lying there for a while, Deputy Koster came up to him and "kicked [him] right directly in [his] injured knee two or three times."  *Id.* at 47.  Deputy Koster directed Plaintiff to put his palms face up.  *Id.* at 46.  Plaintiff believes Deputy Koster used the gesture to get his attention.  *Id.* at 47.  To his knowledge, Deputy Koster was not aware of his knee injury.  *Id.*  Plaintiff did not believe Deputy Koster was trying to hurt him but maintained the use of force hurt him more than another inmate because of his knee injury.  *Id.* at 62.

After Deputy Koster struck him the first time, Plaintiff testified he "kind of . . . yell[ed] in agony."  (ECF No. 22-7 at 47).  Plaintiff has viewed the video of this incident and concedes it does not look like Deputy Koster struck him hard.  *Id.*  However, he testified it was "pretty hard" and directly on the side of his knee.  *Id.* at 47 & 53.

Shortly after the use of force, the deputies were getting inmates up one at a time.  (ECF No. 22-7 at 49-50.  When it was Plaintiff's turn, he "got up and limped away towards where they were patting us down."  *Id.* at 50.  At this time, Plaintiff estimated his pain level was at a 7 or 8.  *Id.*  Plaintiff was patted down and during the process they had him "raise [his] leg bending at the knee to a 90-degree angle" so they could see the bottom of his feet.  *Id.* at 50-51.  While it was painful, Plaintiff did not say anything to the officers.  *Id.* at 51.  Plaintiff believed he was in "shock" from "what just happened."  *Id.*

Once patted down, the inmates went into a small outside recreation area and were instructed to sit down and wait.  (ECF No. 22-7 at 52).  Although it was pretty painful, Plaintiff sat down

"Indian-style." *Id.* Plaintiff did not tell anyone he could not sit in that fashion because of his knee injury. *Id.* Plaintiff remained seated for thirty to forty-five minutes stretching out his legs occasionally. *Id.* at 53. The inmates were then instructed to return to their cells. *Id.* Again, while in the presence of officers, Plaintiff did not notify the officers that his knee was injured. *Id.* at 53.

Deputy Koster has no independent recollection of this incident but has reviewed the video. (ECF No. 22-13 at 2). Deputy Koster indicates the "standard procedure each time is, when the SERT team comes in the door, the first deputies direct everyone to go to the floor and tell them to put their hands out, palms up, so that deputies can see their hands." *Id.* Deputy Koster indicates she "tapped [Plaintiff] with my foot likely to direct him to put his palms up. . . . At most I patted him with the side of my foot and he immediately fixed his hands" *Id.* at 2-3. Although Plaintiff says he yelled out, Deputy Koster asserts that "[i]f he would have, he would have been taken out of the pod immediately." *Id.* at 2.

Plaintiff testified he did not realize how badly his knee was injured until the following day when it "was really painful and swollen." (ECF No. 22-7 at 53). When asked how he knew the swelling and pain was connected to the use of force and not caused by walking around or sitting cross-legged, Plaintiff responded that it was the "only, like, impactful force [to his] knee." *Id.* at 54. Plaintiff testified that bending his knee did not hurt. *Id.* When asked why he wore the brace if bending his knee did not hurt, Plaintiff testified the brace was to "keep all the ligaments and stuff intact, keep them tight." *Id.*

On June 2, 2022, Plaintiff submitted a medical request stating he was in a lot of pain and could barely walk. (ECF No. 22-7 at 55). He was told he would be seen by a nurse. *Id.* at 56;

*see also* (ECF No. 22-3 at 2).   Several days later, on June 6, 2022, Plaintiff was seen by Nurse Robison.   *Id.*; *see also* (ECF No. 27-3 at 12).   Nurse Robison noted Plaintiff complained of pain in his left knee when weight bearing, rated his pain as 3, and was limping.   (ECF No. 27-3 at 6).   Nurse Robison also noted Plaintiff had a prior injury to his left knee and was supposed to have an "MRI but did not follow-up."   *Id.*   Plaintiff was given 400 mg Ibuprofen to be taken twice a day as needed for pain for seven days.   *Id.*   He was instructed to avoid heavy lifting and strenuous work/activity until the problem was resolved.   *Id.*   Plaintiff was advised to follow-up with a sick call if he did not improve.   *Id.*

Plaintiff maintains Nurse Robison did "not really do anything" at this visit except look at his knee and state that "she didn't find anything wrong with it."   (ECF No. 22-7 at 70).   On June 4, 2022, Plaintiff filed a grievance about Deputy Koster's use of force.   (ECF No. 22-7 at 55-56).   Specifically, Plaintiff said he had been "kicked repeatedly in the knee" by a SERT team member and could barely walk, something felt out of place, and he was in pain.   (ECF No. 22-3 at 2).   Plaintiff was told the matter would be looked into and a nurse would be down to see him.   *Id.*

Plaintiff filed a second grievance on June 16th because nothing had been done in response to the first grievance.   (ECF No. 22-7 at 56).   Plaintiff reported Deputy Koster had repeatedly kicked him in the knee.   (ECF No. 22-3 at 3).   Plaintiff also asserted that Nurse Robison was "grossly unqualified to give a proper diagnosis, let alone an unbiased opinion."   *Id.*   Plaintiff reiterated that when he arrived at the jail he had been wearing "several braces on his knee."   *Id.*   He asserted that Deputy Koster had caused his knee further injury.   *Id.*   Lieutenant Derek Stamps responded saying he had looked into the incident and Deputy Koster did not repeatedly kick Plaintiff in the knee.   *Id.*   Instead, Lieutenant Stamps said Deputy Koster had only nudged

Plaintiff's knee.  *Id.; see also* (ECF No. 22-12 at 1 (Stamps' Affidavit)).   Plaintiff was also told

that the medical staff was qualified.   *Id.*   In his affidavit, Lieutenant Stamps notes that the

"camera footage after the SERT callout also showed Plaintiff walking around the pod with no limp

or apparent issue."   (ECF No. 22-12 at 2).

Plaintiff replied on the kiosk, noting that he said kicked and Lieutenant Stamps said nudged

and they could probably agree on something in between.   (ECF No. 22-3 at 4).   Plaintiff was

again advised that it could be seen on camera that he was not kicked.   *Id.*   When asked about this

during his deposition, Plaintiff agreed that he did not think Deputy Koster had really kicked him

but described the action more than a nudge.   (ECF No. 22-7 at 57).

On June 18, 2022, Plaintiff suggested that an MRI of his knee be done to assess the damage.

(ECF No. 22-3 at 4).   Nurse Robison responded that a MRI was suggested following his accident

in December and he did not follow up due to insurance reasons.   *Id.*   She noted that he was seen

on June 6th for knee pain and there was no external swelling at the time.   *Id.*   Nurse Robison was

"advised [Plaintiff] to follow up with [his] orthopedic specialist once . . . release[d] since this was

a pre-existing injury."   *Id.*

On June 20, 2022, Plaintiff submitted another request noting he had been denied any

supportive brace upon his admission to jail.   (ECF No. 22-3 at 5).   He stated this put him in

imminent damager of physical injury.   *Id.*   Plaintiff stated injury occurred when Deputy Koster

"made physical contact with [his] knee repeatedly with her foot."   *Id.*   He again suggested an

MRI be done.   *Id.*   On June 21, 2023, Nurse Robison noted she had offered the Plaintiff his knee

brace and compression pants but he refused because it would mean moving to the medical pod.

(ECF No. 27-3 at 17).   Plaintiff's refusal was documented on a "waiver of treatment/evaluation"

form.   (ECF No. 27-3 at 21).

On June 24, 2022, Plaintiff submitted a request, noting he had been told on June 6, 2022, by Nurse Robison that he would be seen by the provider for his knee.   (ECF No. 22-3 at 6).   On June 25, 2022, Nurse Robison said that she would add him to the list the next time the provider was there.   *Id.*   Although Nurse Robison indicated Plaintiff had not shown any signs or symptoms of a new injury to the knee or required medical attention, she scheduled Plaintiff to be seen on July 1, 2022.   (ECF No. 27-3 at 15).   Nurse Robison also noted that he had been offered his knee brace if he would like to wear it but refused because he did not want to move to the medical pod.   *Id.* Plaintiff was not seen because he was released on June 27th.   *Id.* at 16.[2]

On July 26, 2022, Plaintiff was arrested by the Springdale Police Department.   (ECF No. 22-10 at 4).   Following a high-speed pursuit ending when Plaintiff crashed the stolen vehicle he was driving, Plaintiff ran from the scene on foot.   *Id.* at 5.   One of the charges Plaintiff was booked on was fleeing.   (ECF No. 22-11 at 2).

When booked into the Washington County Detention Center ("WCDC") following his arrest, Plaintiff mentioned he had a "[f]ractured patella and ligament damage."   (ECF No. 22-11 at 17).   A note was made that his records from Ozark Orthopedic and Washington Regional would be ordered and they would continue to monitor his case.   *Id.*

In December of 2022, he was seen by Dr. Carl Lee and had an MRI done.   (ECF No. 22-7 at 29).   Dr. Lee diagnosed Plaintiff with a fracture of the tibial plateau.   *Id.* at 30.   Dr. Lee believed surgery was necessary but not until Plaintiff was released from custody because he was not in an environment conducive to recovery from surgery.   *Id.* at 30.   While at the WCDC,

---

[2] This record erroneously contains a release date of June 28, 2022.

Plaintiff was provided with a brace similar to the one he had received at the Community Clinic but without any metal.   *Id.*

**B.   Video Evidence**

Deputy Koster has provided the Court with two video files from May 31, 2022.[3]   When the first video begins, the inmates can be seen in the day-room of the pod seated at tables or walking around.   When the SERT team enters, the inmates immediately begin going to the floor face down. Plaintiff can be seen at his open cell door way lying face down with his palms down.



Plaintiff is first instructed to put his hands palms up.   Then, Plaintiff is apparently instructed to move out of the doorway because he crawls out until he is fully in the day room.   The SERT team begins to take inmates out of the pod.   Plaintiff shifts positions a number of times.

---

[3] The video files contain no audio.



When Plaintiff shifts into the above position, Deputy Koster walks over and makes contact with his leg three times with the side of her shoe.   Plaintiff then straightens his arms out.



Plaintiff remains with his legs crossed at the ankle.   He does not appear to speak to Deputy Koster.   He does not appear to be in obvious distress.   The SERT team continues to take inmates out of the day-room.

11

When it is Plaintiff's turn to leave the pot, he rises without apparent difficulty bending his left knee as he does.



Plaintiff rose from the floor and walked out without assistance.   However, as he walks out, Plaintiff does appear to walk with a slight limp.



The second video file starts with the day-room empty of inmates and the SERT team members beginning the search of the cells.   Some clothing, linens, and other items are removed by inmates dressed in white and green stripes, presumably trustees, and the floor swept. Eventually, inmates are allowed back into the pod and begin claiming items from the tables and

12

then going to their cells.

Plaintiff walks into the pod showing no signs of distress.   As he walks around the pod and enters his cell, Plaintiff does appear to be favoring his left leg slightly.   However, he does not exhibit any pronounced limp.



## II.   APPLICABLE STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists."   *National Bank of Com. v. Dow Chem. Co*., 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586.   "They must show there is sufficient evidence to support a jury verdict in their favor." *Nat. Bank*, 165 F.3d at 607 (citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986)).   "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id*. (citing *Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)).   "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### III.   DISCUSSION

As previously noted, there are two pending Summary Judgment Motions.   The Court will address the Motions in the order they were filed.

### A.   Deputy Koster's Motion for Summary Judgment

Deputy Koster maintains she is entitled to judgment in her favor on the following grounds: (1) the amount of force used was *de minimus* and objectively reasonable under the circumstances; (2) she is entitled to qualified immunity; and (3) there is no basis for an official liability claim.

### (1).   Excessive Force Claim

The Due Process Clause of the Fourteenth Amendment protects pretrial detainees from the "use of excessive force amounting to punishment." *Kingsley v. Hendrickson,* 576 U.S. 389, 398 (2015)(quoting *Graham v. Connor*, 490 U.S. 386, 396 n. 10 (1989)); *Smith v. Conway Cty., Ark.,* 759 F.3d 853, 858 (8th Cir. 2014).   The Fourth Amendment's "objective reasonableness" standard applies when analyzing these claims. *Kingsley,* 576 U.S. at 394.   To support an excessive force

claim, a "pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." *Id.* at 396-97.   The objective reasonableness of a use of force "turns on the 'facts and circumstances of each particular case.'" *Id.* at 397 (quoting *Graham*, 490 U.S. at 396).

A "court must judge the reasonableness of the force used from the perspective and the knowledge of the defendant officer." *Kingsley,* 576 U.S. at 399.   The Court must also "account for the "legitimate interests that stem from the government's need to manage the facility in which the individual is detained," appropriately deferring to 'policies and practices that in the judgment of jail officials are needed to preserve internal order and security.'" *Id.* at 397 (quoting *Bell v. Wolfish,* 441 U.S. 520, 540, 547 (1979)).   An action is objectively unreasonable if it is not reasonably related to legitimate governmental interests, such as maintaining order and security, or is excessive in relation to that objective.   *Kingsley,* 576 U.S. at 398-99.   The Court must also keep in mind that the mere fact that injuries occurred does not support an excessive force claim if they are the result of a "*de minimus* use of force."   *Hunter v. Namanny*, 219 F.3d 825, 831 (8th Cir. 2000).

"[O]bjective circumstances potentially relevant to a determination of excessive force" include:

> the reasonableness or unreasonableness of the force used; the relationship between the need for the use of force and the amount of force used; the extent of plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether plaintiff was actively resisting.

*Kingsley*, 576 U.S. at 397 (citing *Graham* 490 U.S. at 396).

Here, Deputy Koster asserts that the video provides conclusive evidence that she did not

use excessive force against the Plaintiff.[4]   The Court agrees.   The video shows Deputy Koster standing next to the Plaintiff and merely nudging or tapping him with her foot in an effort to get his attention.   Because the rules prohibited Plaintiff from wearing his brace or compression pants in the general population pod, he had nothing on his knee or leg that would have suggested to a reasonable officer that he had any type of knee injury.   In fact, Plaintiff concedes Deputy Koster did not know about his knee injury.   (ECF No. 22-7 at 47).

While Deputy Koster used a small amount of force to gain Plaintiff's attention, it was not unreasonable under the circumstances.   The officers were there to conduct a search of the pod and its inmates.   The inmates were all lying face down on the floor and were supposed to have their arms in front of them palms up.   Plaintiff had shifted his position.

In his grievances and during his deposition, Plaintiff likened the amount of force used to a kick or repeated kicks.   (ECF No. 22-3 at 2 (kicked repeatedly)); (ECF No. 22-7 at 47 (kicked me hard)).   However, when pressed by defense counsel, Plaintiff agreed that he did not really believe Deputy Koster kicked him but contended it was more than a nudge.   (ECF No. 22-7 at 57).   In her affidavit, Deputy Foster said she "tapped" Plaintiff with her foot.   (ECF No. 23-13 at 2).   Lieutenant Stamps referred to the amount of force used as a "nudge" to obtain Plaintiff's attention. (ECF No. 22-12 at 1).

The word kick is defined as "a blow or sudden forceful thrust with the foot.[5]"   The word

---

[4] Plaintiff's Response consists of a single paragraph.   He states that the evidence has already been submitted.   Plaintiff then says:   "There is video evidence of Deputy Koster kicking me while I was face down on the ground.   It is also well documented that my knee is severely injured." (ECF No. 26).   Plaintiff's Response does not comply with Rule 56.1 of the Local Rules for the Eastern and Western Districts of Arkansas or the Court's Order (ECF No. 24) which contained detailed and explicit instructions on what his response must contain.
[5] https://www.merriam-webster.com/dictionary/kick (last visited August 11, 2023).

nudge is to defined as "to touch or push gently" or to "prod lightly.[6]"   The word tap or tapping is defined as "to strike lightly" or "to bring about repeated light blows.[7]"   While Plaintiff maintains this is mere semantics, with excessive force claims, the nature and quantum of force used is the most important aspect of the Court's inquiry.   (ECF No. 22-3 at 4).   All three words are attempts to describe or quantify an action.   While the Court agrees with the Plaintiff that some amount of force was used by Deputy Koster to gain his attention, the video clearly shows there was no forceful thrust of the foot.   The difference between an action perceived as a kick and one perceived as a nudge or a tap serves to answer the question of whether Deputy Koster's action was objectively reasonable or not under the existing circumstances.   Giving the Plaintiff the benefit of all inferences in his favor, the amount of force used by Deputy Koster could not be considered unreasonable.   Plaintiff has failed to show the existence of a genuine issue of material fact as to whether Deputy Koster's use of force was unreasonable under the circumstances.

Deputy Koster is entitled to summary judgment on the individual capacity claim against her.

### (2).   Qualified Immunity

"Government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."   *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).   "The qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the

---

[6] https://www.merriam-webster.com/dictionary/nudge (last visited August 11, 2023).
[7] https://www.merriam-webster.com/dictionary/tap (last visited August 14, 2023).

law.'" *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 341-43 (1986)).

"A plaintiff bringing a claim under 42 U.S.C. § 1983 must show that the officer violated a constitutional right, and that the right was clearly established at the time of the violation." *Buschmann v. Kansas City Bd. of Police Commi'rs,* ___ F.4th ___, 2023 WL 5113497, *2 (8th Cir. Aug. 10, 2023)(citing *Pearson v. Callahan,* 555 U.S. 223, 232 (2009)).   A right is considered to be clearly established "only if any reasonable officer would understand that what he is doing violates that right."   *Id.* (citing *Anderson v. Creighton,* 483 U.S. 635, 640 (1987)).

In this case, the Court has found no genuine issue of material fact exists as to whether Deputy Koster used an unreasonable amount of force against Plaintiff.   Because the facts do not make out a constitutional violation, Deputy Koster is entitled to qualified immunity.   *See, e.g., Krout v. Goemmer*, 583 F.3d 557, 564 (8th Cir. 2009) (unless the facts make out a violation of a constitutional right the Defendant is entitled to qualified immunity).

**(3).   Official Capacity Claim**

An official capacity claim is considered a claim against the employing governmental entity, here, Benton County.   *White v. Jackson*, 865 F.3d 1064, 1075 (8th Cir. 2017).   A governmental entity may not be held liable for an injury inflicted solely by its employees or agents on a *respondeat superior* theory of liability.   *Monell v. New York Dep't of Soc. Servs.,* 436 U.S. 658, 694 (1978).   "Section 1983 liability for a constitutional violation may attach to a municipality if the violation resulted from (1) an 'official municipal policy,' (2) an unofficial 'custom,' or (3) a deliberately indifferent failure to train or supervise."   *Corwin v. City of Independence, Mo.,* 829 F.3d 695, 699 (8th Cir. 2016)(citations omitted).

18

In order for municipal liability to attach, individual liability first must be found on an underlying substantive claim. *See e.g., Ivey v. Audrain Cty., Mo.*, 968 F.3d 845, 851 (8th Cir. 2020) (if the individual officers are entitled to qualified immunity under the first prong of the analysis, *i.e.*, no evidence of a constitutional violation, then the county cannot be held liable); *McCoy v. City of Monticello,* 411 F.3d 920, 922 (8th Cir. 2005)(summary judgment for defendant officer on excessive force claim precluded the City from liability on an unconstitutional policy or custom theory or failure-to-train theory).   As there is no individual liability, Deputy Koster is entitled to summary judgment on Plaintiff's official capacity liability claim.

## B.  Nurse Robison's Summary Judgment Motion

Nurse Robison contends she is entitled to summary judgment on the following grounds: (1) she was not deliberately indifferent to Plaintiff's medical needs; and (2) there is no basis for official capacity liability.[8]

### (1).  Medical Care Claim

While a pretrial detainee's denial of medical care claim arises under the Due Process Clause of the Fourteenth Amendment, the Eighth Circuit analyzes such claims under the deliberate indifference standard of the Eighth Amendment.   *See e.g., Morris v. Cradduck*, 954 F.3d 1055, 1055 (8th Cir. 2020)(pretrial detainee has the same rights to medical care under the Due Process Clause as an inmate has under the Eighth Amendment).[9]   The Court therefore examines Plaintiff's

---

[8] Plaintiff's Response to Nurse Robison's Motion is identical to the one he filed with respect to Deputy Koster's Motion.   *Compare* (ECF No. 32); (ECF No. 26).

[9] The Eighth Circuit has acknowledged that pretrial detainees' claims may be subject to an objective reasonable test rather than the subjective deliberate indifference standard.   *Spencer v. Knapheide Truck Equip. Co.,* 183 F.3d 902, 905 (8th Cir. 1999).   However, in 2016, the Eighth Circuit, while declining to address the proper constitutional standard, noted that it was not clearly established that a pretrial detainee was entitled to more protection than that provided by the Eighth

claims under the Eighth Amendment's deliberate indifference standard.  *Morris,* 954 F.3d. at 1058.

To succeed on this type of claim, Plaintiff must demonstrate (1) that he had an objectively serious medical need and (2) that Nurse Robison actually knew of but deliberately disregarded that need.  *See Ivey v. Audrain Cty., Mo.,* 968 F.3d 845, 848 (8th Cir. 2020)(cleaned up).  "A serious medical need is one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Coleman v. Rahija,* 114 F.3d 778, 784 (8th Cir. 1997).  Here, Plaintiff satisfies the first prong of our inquiry, *i.e.,* whether Plaintiff had a serious medical need.  He had been diagnosed with a possible Segond fracture and there was a concern that his ligaments were injured.

The Court therefore turns to the deliberate indifference prong.  "To demonstrate that a defendant actually knew of, but deliberately disregarded, a serious medical need, the plaintiff must establish a mental state akin to criminal recklessness:  disregarding a known risk to the [Plaintiff's] health."  *Barton v. Taber,* 908 F.3d 1119, 1124 (8th Cir. 2018)(*Barton II*)(cleaned up).  The Eighth Circuit has stated that this "onerous standard requires a showing more than negligence, more than even gross negligence, but less than purposefully causing or knowingly bringing about a substantial risk of serious harm to the inmate."  *Thompson v. King,* 730 F.3d 742, 747 (8th Cir. 2013)(cleaned up).  "[W]hatever its exact contours, deliberate indifference requires

---

Amendment.  *Bailey v. Feltmann,* 810 F.3d 589, 593 (8th Cir. 2016).  In the context of conditions of confinement claims brought by pretrial detainees, in 2020, the Eighth Circuit clarified that pretrial detainees' conditions of confinement claims are to be analyzed under the Fourteenth Amendment's Due Process Clause rather than under the Eighth Amendment standards.  *See Sterans v. Inmate Servs. Corp.,* 957 F.3d 902, 906 (8th Cir. 2020).  Thus, in at least two areas— the use of excessive force and conditions of confinement—pretrial detainees are entitled to more protection than convicted prisoners.

a highly culpable state of mind approaching actual intent."   *Choate v. Lockhart,* 7 F.3d 1370, 1374 (8th Cir. 1993).

It is concerning to the Court that the medical records do not reflect that Plaintiff was examined at intake or scheduled for examination due to his report of a fractured patella, particularly in light of the undisputed fact that he came into the jail wearing a compression sock, a brace, an ace bandage, and compression pants.   Instead, all supportive materials/devices were taken away from Plaintiff and he was determined to be eligible for general population.   However, this is not the issue before this Court.   Rather, the issue is whether Nurse Robison, in her interactions with Plaintiff, exhibited deliberate indifference to his serious medical needs.   In this regard, the Court notes Nurse Robison was not the nurse who signed the booking questionnaire or performed the intake medical screening.

The first interaction between Plaintiff and Nurse Robison occurred after Plaintiff submitted a written request over the kiosk on May 21, 2022, asking to have his knee brace and compression pants.   If there was a documented medical need for the items, Nurse Robison responded he would be able to have the items but he would need to be moved to the medical pod.   Plaintiff did not respond.

The only in-person interaction occurred on June 6, 2022, when Nurse Robison examined Plaintiff after his complaints of knee injury following his encounter with Deputy Koster.   At the time, Nurse Robison noted Plaintiff presented with complaints of knee pain, estimated to be at a 3 on the pain scale, was limping, and had a slightly decreased range of motion.   Nurse Robison prescribed Ibuprofen, twice a day, for seven days on an as needed basis.   Plaintiff did not use all doses available to him and did not request more Ibuprofen.   Instead, he began asking for an MRI

to be performed.

On June 20, 2022, Nurse Robison responded to a medical request by stating that Plaintiff's scooter accident occurred prior to his incarceration and he failed to follow-up by getting the MRI as directed by his orthopedic doctor.   She advised Plaintiff to follow-up with his orthopedic specialist once he was released from jail since this was a pre-existing condition.   On June 21, 2022, Plaintiff was offered the knee brace and compression pants he had been wearing when booked in.   However, it was noted he refused them because it meant he would be moved to the medical pod—with more restrictions—because of the potential the items could be used as weapons.   On June 24, 2022, Plaintiff submitted a request complaining that he had been advised by Nurse Robison that he would be scheduled to see the provider.   Nurse Robison scheduled him to see the provider.   However, Plaintiff was released prior to the appointment date.   This is the sum total of the interactions between Plaintiff and Nurse Robison.

Plaintiff concedes that it was BCDC policies that kept him from being able to have his brace and compression pants in general population.   He also concedes that he refused to move to the medical pod so he could have his supportive devices and chose instead to remain in general population.   In his deposition and Complaint,[10] Plaintiff points out that Nurse Robison knew of his injury, knew an MRI had been recommended, and knew of the probable necessity of surgery. He also argues that Nurse Robison's examination of him was not sufficiently thorough; she should have scheduled him to see the provider more quickly; and/or should have ensured he was scheduled

---

[10] The Court is free to consider Plaintiff's factual statements made in his verified complaint.   *See Roberson v. Hayti Police Dept.*, 241 F.3d 992, 995 (8th Cir. 2001)("Although a party may not generally rest on his pleadings to create a fact issue sufficient to survive summary judgment, the facts alleged in a verified complaint need not be repeated in a responsive affidavit in order to survive a summary judgment motion").

for an MRI.

While Plaintiff has a constitutional right to receive reasonably adequate medical care, the constitution does not require that a medical complaint be handled as quickly as an inmate might wish. *Jenkins v. Cty. of Hennepin, Minn.,* 557 F.3d 628, 632 (8th Cir. 2009). When an inmate contends necessary medical treatment was delayed, the "objective seriousness of the deprivation should also be measured by reference to the *effect* of the delay in treatment." *Laughlin v. Schriro,* 430 F.3d 927, 929 (8th Cir. 2005). Plaintiff must "present verifying medical evidence that the [official] ignored an acute or escalating situation or that [these] delays adversely affected his prognosis." *Holden v. Hirner,* 663 F.3d 336, 342 (8th Cir. 2011). Here, Plaintiff must produce evidence showing the delay had a harmful effect on the condition of his knee. No such evidence exists in this case. Instead, the evidence establishes that even after an MRI was performed, the orthopedic surgeon recommended that surgery not be performed while Plaintiff was incarcerated. Nothing indicates the condition of his knee was worsened as a result of any delay in his care while at the BCDC.

Turning to the subjective component, Plaintiff faces an onerous burden in attempting to show a genuine issue of material fact exists as to whether Nurse Robison has exhibited deliberate indifference to his serious medical needs. "A plaintiff can show deliberate indifference in the level of care provided in different ways, including showing grossly incompetent care, showing a defendant's decision to take an easier and less efficacious course of treatment, or showing a defendant intentionally delayed or denied access to medical care." *Allard v. Baldwin,* 779 F.3d 768, 772 (8th Cir. 2015). Plaintiff's first complaint regarding knee pain was not submitted until after the incident with Deputy Foster. Plaintiff was seen, prescribed Ibuprofen, and did not even

take all the Ibuprofen prescribed.   He then began asking for an MRI based on the recommendation of Dr. Coker and because of the aggravation of the injury.   It is undisputed that Nurse Robison could not herself order an MRI.   Plaintiff was scheduled to see the provider.   The facts fall short of establishing any evidence of deliberate indifference.   For these reasons, the Court concludes there is no genuine issue of material fact as to whether Nurse Robison exhibited deliberate indifference to Plaintiff's serious medical needs.

Nurse Robison is entitled to summary judgment on the individual capacity claims.

### (2).   Official Capacity Claim

At his deposition, Plaintiff was asked what policy, practice, or custom, he believed caused the denial of his medical care; Plaintiff replied that he was relying on his medical inquiries and the time it took to schedule the appointment for him.   (ECF No. 22-7 at 76).   He testified he was not aware of any specific practice, policy, or custom that Nurse Robison created that caused his injuries.   *Id.* at 76-77.   The official capacity claim is considered to be a claim against Nurse Robison's employer, Turn Key Health Clinics, LLC—not Nurse Robison—unless she had final policy making authority.   Regardless, it is clear that Plaintiff's allegations and testimony falls far short of that necessary to impose liability on Turn Key.   *See e.g., Johnson v. Hamilton,* 453 F.3d 967, 973 (8th Cir. 2006)(must show there was a policy, custom, or official action of the medical care contractor that inflicted an actionable injury).

Nurse Robison is entitled to summary judgment on the official capacity claim.

### V.   CONCLUSION

For these reasons, it is recommended that:

- Deputy Koster's Motion for Summary Judgment (ECF No. 20) be **GRANTED;**

24

and

- Nurse Robison's Motion for Summary Judgment (ECF No. 27) be **GRANTED** and the case be **DISMISSED WITH PREJUDICE.**

**The parties have fourteen days from receipt of the Report and Recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).   The failure to file timely objections may result in waiver of the right to appeal questions of fact.   The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 16th day of August 2023.

/s/ *Christy Comstock*
_____
HON. CHRISTY COMSTOCK
UNITED STATES MAGISTRATE JUDGE